USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 96-2028 INSTITUT PASTEUR AND PASTEUR SANOFI DIAGNOSTICS, Appellants, v. CAMBRIDGE BIOTECH CORPORATION, Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________  ____________________ Before Cyr, Boudin and Lynch, Circuit Judges. ______________  ____________________ Jeffrey D. Sternklar, with whom Michael Gottfried and Burns & _____________________ __________________ _______ Levinson LLP were on brief for appellants.  ____________ Joseph F. Ryan, with whom Jeffrey L. Jonas, Anthony L. Gray, _______________ _________________ ________________ Andrew P. Strehle and Brown, Rudnick, Freed & Gesmer, P.C. were on __________________ _____________________________________ brief for appellee.  ____________________ January 17, 1997  ____________________ CYR, Circuit Judge. Unsuccessful in their intermedi- CYR, Circuit Judge. _____________ ate appeal to the district court, Institut Pasteur and Pasteur Sanofi Diagnostics [collectively: "Pasteur"] again appeal from the bankruptcy court order which confirmed the chapter 11 reorga- nization plan ("Plan") proposed by debtor-in-possession Cambridge Biotech Corporation ("CBC"), the holder of two licenses to utilize Pasteur patents. The Plan provision central to the present dispute calls for the sale of all CBC stock to a subsid- iary of bioMerieux Vitek, Inc. ("bioMerieux"), a major competitor of appellant Pasteur. Finding no error, we affirm. I I BACKGROUND BACKGROUND __________ CBC manufactures and sells retroviral diagnostic tests for detecting the human immunodeficiency virus (HIV) associated with AIDS. Its HIV diagnostics division annually generates approximately $14 million in revenues. Institut Pasteur, a nonprofit French foundation engaged in AIDS-related research and development, owns various patented procedures for diagnosing HIV Virus Type 2 ("HIV2 procedures"). Pasteur Sanofi Diagnostics holds the exclusive right to use and sublicense Institut Pasteur's patents. In October 1989, CBC and Pasteur entered into mutual cross-license agreements, whereby each acquired a nonexclusive perpetual license to use some of the technology patented or licensed by the other. Specifically, CBC acquired the right to incorporate Pasteur's HIV2 procedures into any diagnostic kits 2 sold by CBC in the United States, Canada, Mexico, Australia, New Zealand and elsewhere.1  Each cross-license broadly prohibits the licensee from assigning or sublicensing to others. See Royalty-Free Cross- ___ License, at 7.1; Royalty-Bearing Cross-License, at 8.1 ("[N]o other person shall acquire or have any right under or by virtue of this Agreement."). Nevertheless, either Pasteur or CBC was authorized to "extend to its Affiliated Companies the benefits of this Agreement so that such party shall remain responsible with regard [to] all [license] obligations." Id. 1.4. "Affiliated ___ Company" is defined as "an organization which controls or is controlled by a party or an organization which is under common control with a party." Id. ___ CBC filed its chapter 11 petition on July 7, 1994, and thereafter continued to operate its retroviral diagnostic testing business as debtor-in-possession. Its reorganization plan proposed that CBC assume both cross-licenses, see 11 U.S.C. 365 ___ (executory contracts),2 continue to operate its retroviral diagnostics division utilizing Pasteur's patented HIV2 proce- dures, and sell all CBC stock to a subsidiary of bioMerieux, a giant French biotechnology corporation and Pasteur's direct  ____________________ 1These cross-licenses expressly provide that Massachusetts law governs their interpretation. See Royalty-Free Cross-Li- ___ cense, at 9; Royalty-Bearing Cross-License, at 10.  2The parties agree that the cross-licenses are "executory contracts," since substantial performance remains due by both parties. See Summit Inv. & Dev. Corp. v. Leroux (In re Leroux), ___ ________________________ ______ ____________ 69 F.3d 608, 610 n.3 (1st Cir. 1995). 3 competitor in international biotechnology sales. Pasteur previ- ously had licensed bioMerieux to use its HIV2 procedures, but the earlier license related to a single product manufactured by bioMerieux (i.e., bioMerieux's VIDAS automated immunoassay test ____ system), and applied only to VIDAS sales in markets other than _____ ____ the United States, Canada, Mexico, Australia, and New Zealand, markets expressly encompassed within the CBC cross-licenses.  Not surprisingly, in due course Pasteur objected to the Plan. Citing Bankruptcy Code 365(c), 11 U.S.C. 365(c), it contended that the proposed sale of CBC's stock to bioMerieux amounted to CBC's assumption of the patent cross-licenses and their de facto "assignment" to a third party in contravention of __ _____ the presumption of nonassignability ordained by the federal common law of patents, as well as the explicit nonassignability provision contained in the cross-licenses. Isabelle Bressac, Pasteur's licensing director, attested that Pasteur would not have granted its competitor, bioMerieux, or a subsidiary, a patent license under the terms allowed CBC.   The bankruptcy court authorized CBC to assume the cross-licenses over Pasteur's objection. It ruled that the proposed sale of CBC stock to bioMerieux did not constitute a de __ facto "assignment" of the cross-licenses to bioMerieux, but _____ merely an assumption of the cross-licenses by the reorganized debtor under new ownership, and that Bankruptcy Code 365(c) enabled CBC to assume the cross-licenses as debtor-in-possession because the prepetition licensing relationship between Pasteur 4 and CBC was neither "unique" nor "something in the category of a personal services contract." In re Cambridge Biotech Corp., No. ______________________________ 94-43054, slip op. at 17-18, 24 (Bankr. D. Mass. Sept. 18, 1996); Tr. 176-77.3 The district court upheld the bankruptcy court ruling on intermediate appeal.  II II DISCUSSION DISCUSSION __________ A. Appellate Jurisdiction A. Appellate Jurisdiction ______________________ Citing our decision in Rochman v. Northeast Utils. _______ _________________ Serv. Group (In re Public Serv. Co. of N.H.), 963 F.2d 469 (1st ____________ _______________________________ Cir.) ("Public Service"), cert. denied, 506 U.S. 908 (1992), CBC ______________ _____ ______ now moves to dismiss the appeal for lack of appellate jurisdic- tion. It contends that Pasteur failed to pursue all available remedies for preserving a temporary stay of the confirmation order pending appeal after this court lifted the temporary stay on October 9, 1996.4 See Trone v. Roberts Farms, Inc. (In re ___ _____ ____________________ ______ Roberts Farms, Inc.), 652 F.2d 793, 798 (9th Cir. 1981) (noting ___________________ that appellant should file motion to stay judgment with Circuit  ____________________ 3The bankruptcy court further found that the Plan had been proposed in good faith, see 11 U.S.C. 1129(a)(3), and that the ___ stock sale to bioMerieux had been negotiated in good faith and at arm's length. In re Cambridge Biotech Corp., No. 94-43054, slip _____________________________ op. at 7, 12. 4A series of stays had prevented CBC from consummating the Plan by August 2, 1996, as scheduled, and a final consummation date was set for October 31, 1996. In early October, CBC asked this court to vacate the pending stay, claiming that further delay threatened irreparable injury. It represented that almost half its employees had quit during the preceding year, jittery clients had begun to cancel contracts, and that its revenues had declined by 10%. 5 Justice if necessary). Since CBC substantially consummated its ___________ Plan on October 21, 1996, it argues that Pasteur can no longer be afforded complete relief because neither this court nor the bankruptcy court has jurisdiction over the many third parties affected by, and much of the res distributed pursuant to, the ___ consummated Plan. Finally, CBC argues, no court can now provide Pasteur with meaningful partial relief, such as selective rescis- sion of the stock sale or the cross-license assumption/assignment provisions, because retention of these cross-licenses by CBC is indispensable to any successful reorganization of its retroviral diagnostics business, and, from bioMerieux's standpoint, is a "deal-busting" component of the Plan. See Plan IX.B.2.a ___ ("[P]rovisions of the Confirmation Order are nonseverable and mutually dependent."). We disagree. Contrary to CBC's suggestion, our Public Service _______________ decision does not reduce to the simplistic theme that appellate courts invariably are deprived of jurisdiction by the lack (or premature dissolution) of a stay which results in substantial plan consummation prior to final disposition of the appeal. Rather, we rested our decision in Public Service primarily on two ______________ circumstantial considerations. See In re Andreuccetti, 975 F.2d ___ __________________ 413, 418 (7th Cir. 1992) (noting that Public Service contem- ______________ plates that "'[t]he court should reach a determination upon close consideration of the relief sought in light of the facts of the particular case'") (citation omitted).  First, the equities weighed heavily against the appel- 6 lants in Public Service, who repeatedly and inexplicably failed ______________ to avail themselves of interlocutory appeals from earlier denials of their requests for stay by the courts below. As a consequence of their notable lack of diligence, a full sixteen months had elapsed from the date of confirmation, during which "implementa- tion of the confirmed plan proceeded apace." In re Public Serv., __________________ 963 F.2d at 472. In contrast, Pasteur assiduously preserved its stay throughout the three-month period which elapsed following confirmation, and, on the day this court dissolved the temporary stay, we expedited the Pasteur appeal.  Second, Public Service involved extraordinarily intri- ______________ cate Plan provisions, as well as a multi-billion dollar enter- prise, with the result that any attempted Plan dismantling following the substantial and unexcused lapses by appellants would have produced "'a nightmarish situation for the bankruptcy court on remand.'" Id. at 474 (citation omitted); see, e.g., ___ ___ ____ Baker & Drake, Inc. v. Public Serv. Comm'n of Nev., 35 F.3d 1348, ___________________ ___________________________ 1351-52 (9th Cir. 1994) (finding appellate jurisdiction, and noting that reorganization plan at issue was "not a complex, billion-dollar affair" like the plans in Trone and Public Ser- _____ ___________ vice). Although the CBC Plan is not without its own complexi- ____ ties, CBC is a much less complex enterprise than Public Service, and its Plan was substantially consummated much more recently in relation to the date of appeal.5   ____________________ 5The equitable and pragmatic tests employed in Public ______ Service are symbiotic. See In re UNR Indus., 20 F.3d 766, 769 _______ ___ _________________ (7th Cir.), cert. denied, 115 S. Ct. 509 (1994) ("There is a big _____ ______ 7 We need not resolve the jurisdictional challenge urged upon us by CBC, however, since the merits of Pasteur's contention that CBC's assumption of the cross-licenses and its sale of stock to the bioMerieux subsidiary contravene Bankruptcy Code  365(c) are readily dispatched. See Casco N. Bank. N.A. v. DN ___ ___________________ __ Assocs. (In re DN Assocs.), 3 F.3d 512, 515 (1st Cir. 1993) _______ __________________ (noting that appellate court may bypass jurisdictional questions where appeal would falter on merits even assuming jurisdiction) (citing Norton v. Mathews, 427 U.S. 524, 532 (1976)). ______ _______ B. The Merits6 B. The Merits __________ Pasteur argues that the CBC Plan effects a de facto __ _____ assignment of its two cross-licenses to bioMerieux, contrary to Bankruptcy Code 365(c)(1) which provides as follows:  The trustee [viz., CBC]7 may not assume or ____ assign any executory contract . . . , whether or not such contract . . . prohibits or re- stricts assignment of rights or delegation of duties, if  (1)(A) applicable law excuses a party[] other than the debtor[] [viz., Pasteur] ____ to such contract . . . from accepting  ____________________ difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome ('equitable mootness')," and "[u]sing one word for two different concepts breeds confu- sion"; instead, appellate courts ultimately must ask "whether it is prudent to upset the plan of reorganization at this late date.") (citations omitted).  6We review the district court's conclusions of law de novo __ ____ and the bankruptcy court's findings of fact for clear error only. See Petit v. Fessenden, 80 F.3d 29, 32 (1st Cir. 1996). ___ _____ _________ 7As debtor-in-possession, CBC has substantially the same rights and powers as a chapter 11 trustee, including the power to assume executory contracts under Bankruptcy Code 365. See 11 ___ U.S.C. 1107. 8 performance from or rendering perfor- mance to an entity other than the debtor or the debtor in possession, whether or not such contract . . . prohibits or re- stricts assumption or assignment; and  (B) such party [viz., Pasteur] does not ___ consent to such assumption or assignment . . . . 11 U.S.C. 365(c)(1).  Pasteur argues that in order to encourage optimum product innovation the federal common law of patents presumes that patent licensees, such as CBC, may not sublicense to third parties absent the patent holder's consent. See, e.g., Commis- ___ ____ _______ sioner v. Sunnen, 333 U.S. 591, 609 (1948). This federal common ______ ______ law rule of presumptive nonassignability thus qualifies as an "applicable law," within the meaning of Bankruptcy Code  365(c)(1)(A), which precludes Pasteur from being compelled to accept performance from any entity other than CBC e.g., ____ bioMerieux's subsidiary and therefore prevents CBC from either ______ assuming or assigning these cross-licenses. See Everex Sys., __ ___ ____________ Inc. v. Cadtrak Corp. (In re CFLC, Inc.), 89 F.3d 673, 679-80 ____ ______________ _________________ (9th Cir. 1996) (federal patent law of nonassignability preempts state law relating to patent license assignability). Further, says Pasteur, even assuming that section 365(c) might allow a debtor simply to assume the cross-licenses without a subsequent _______ _ __________ assignment to a third party, CBC formally structured this Plan __________ ________ transaction as an assumption by the debtor-in-possession, whereas in substance it was an assignment of the cross-licenses to __ _________ bioMerieux, a complete stranger to the original cross-licensing 9 agreements.  These contentions are foreclosed by our decision in Summit Inv. & Dev. Corp. v. Leroux (In re Leroux), 69 F.3d 608 _________________________ ______ ____________ (1st Cir. 1995),8 which analyzed and interpreted companion Bankruptcy Code subsections 365(c) and (e) and their relevant legislative history.9 As in the present case, in Leroux we were ______ urged to interpret subsections 365(c) and (e) as mandating a "hypothetical test." Under such an approach, the chapter 11 debtor would lose its option to assume the contract, even though ______ it never intended to assign the contract to another entity, if either the particular executory contract or the applicable nonbankruptcy law purported to terminate the contract automati- cally upon the filing of the chapter 11 petition or to preclude its assignment to an entity not a party to the contract. Id. at ___ 612.  We rejected the proposed hypothetical test in Leroux, ______ holding instead that subsections 365(c) and (e) contemplate a case-by-case inquiry into whether the nondebtor party (viz., ____  ____________________ 8See Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st ___ ________ __________________ Cir.) ("In a multi-panel circuit, newly constituted panels are, for the most part, bound by prior panel decisions closely on point."), cert. denied, 116 S. Ct. 51 (1995). _____ ______ 9Bankruptcy Code 365(e)(2)(A) provides that a statutory or contractual termination provision, which is contingent upon the filing of a bankruptcy petition, may be enforceable in bankruptcy if the "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or render- ing performance to the trustee or to an assignee of such contract __ ___ _______ __ __ __ ________ or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (ii) such party does not consent to such assumption or assignment . . . ." 11 U.S.C. 365(e)(2)(A) (emphasis added). 10 Pasteur) actually was being "forced to accept performance under ________ its executory contract from someone other than the debtor party with whom it originally contracted." Id. Where the particular ___ transaction envisions that the debtor-in-possession would assume and continue to perform under an executory contract, the bank- ruptcy court cannot simply presume as a matter of law that the debtor-in-possession is a legal entity materially distinct from __________ the prepetition debtor with whom the nondebtor party (viz., ____ Pasteur) contracted. Id. at 613-14 (citing H.R. Rep. No. 1195, ___ 96th Cong., 2d Sess. 27(b) (1980); NLRB v. Bildisco & ____ __________ Bildisco, 465 U.S. 513, 528 (1984)). Rather, "sensitive to the ________ rights of the nondebtor party (viz., Pasteur)," the bankruptcy ____ court must focus on the performance actually to be rendered by the debtor-in-possession with a view to ensuring that the nondebtor party (viz., Pasteur) will receive "the full benefit of ___ [its] bargain." Id. at 612-13 (citing S. Rep. No. 989, 95th ___ Cong., 2d Sess. 59 (1978), reprinted in 1980 U.S.C.C.A.N. 5787, _________ __ 5845).  Given the pragmatic "actual performance" test adopted in Leroux, the ultimate findings of fact and conclusions of law ______ made by the bankruptcy court10 below did not constitute error. CBC simply does not occupy the same position as the debtor in CFLC, Inc., 89 F.3d 673 (9th Cir. 1996), upon which Pasteur ___________  ____________________ 10We are not persuaded by Pasteur's contention that the failure to cite Leroux in the confirmation order indicates that ______ the bankruptcy court failed to follow it. Pasteur itself cited Leroux at the July 1996 confirmation hearing, and the bankruptcy ______ court's ultimate findings faithfully track its model.  11 relies most heavily. The Plan in CFLC, Inc. unmistakably provid- __________ ed for an outright assignment of the debtor's patent license to __________ an entirely different corporation with which the patent holder Cadtrak Corporation had never contracted. Id. at 679-80. By ___ contrast, CBC all along has conducted, and proposes to continue, its retroviral diagnostic enterprise as the same corporate entity which functioned prepetition, while utilizing Pasteur's HIV2 procedures in that same prepetition endeavor.  Pasteur nonetheless insists that the reorganized CBC is different than the prepetition entity, not due merely to its chapter 11 filing but because it is now owned by a different _____ __ legal entity than before namely, bioMerieux's subsidiary qua ___ CBC shareholder. Pasteur's contention finds no support, however, either in Massachusetts law, see supra note 1, or in the cross- ___ _____ license provisions it negotiated.  Stock sales are not mergers whereby outright title and ownership of the licensee-corporation's assets (including its patent licenses) pass to the acquiring corporation. Rather, as a corporation, CBC "is a legal entity distinct from its sharehold- ers." Seagram Distillers Co. v. Alcoholic Beverages Control ________________________ _____________________________ Comm'n, 519 N.E.2d 276, 281 (Mass. 1988) (citing 6 William M. ______ Fletcher, Cyclopedia of Corporations 2456 (1979 & Supp. 1986)). Absent compelling grounds for disregarding its corporate form, therefore, CBC's separate legal identity, and its ownership of the patent cross-licenses, survive without interruption notwith- standing repeated and even drastic changes in its ownership. See ___ 12 id. (holding that corporation's sale of all its capital stock ___ does not alter its identity, nor effect a transfer of the corporation's executory contracts or licenses); see also PPG ___ ____ ___ Indus. v. Guardian Indus. Corp., 597 F.2d 1090, 1096 (6th Cir.), ______ _____________________ cert. denied, 444 U.S. 930 (1979) (same; distinguishing mere sale _____ ______ of stock from a transfer of patent license as part of corporate merger wherein merging licensee ends its corporate existence). Pasteur cites no apposite authority to the contrary. Furthermore, Pasteur's position finds no support in the negotiated terms of its cross-licenses. As the patent holder  and given CBC's corporate form and the governing Massachusetts law, supra Pasteur was free to negotiate restrictions on CBC's _____ continuing rights under the cross-licenses based on changes in its stock ownership or corporate control. See id. at 1095 ___ ___ (parties may override law of merger by negotiating express patent license provision); see also Seagram, 519 N.E.2d at 280-81.11 ___ ____ _______ Nevertheless, these cross-licenses contain no provision either limiting or terminating CBC's rights in the event its stock ownership were to change hands. The generic nonassignability provisions found in these cross-licenses, see, e.g., Royalty-Free ___ ____ Cross-License, at 7.1 ("This Agreement . . . has been made solely for the benefit of the parties hereto" and "no other person shall acquire or have any right under or by virtue of this  ____________________ 11Notwithstanding Pasteur's reliance on the important policy goals animating the federal common law of patents, the product- innovation theme promoted under patent law may well be accommo- dated by allowing patent holders to control sublicensing through _______ negotiated contract restrictions.  __________ ________ ____________ 13 Agreement."), plainly do not address the circumstance presented here. Rather, these nonassignability provisions simply beg the essential question, which is whether bioMerieux's subsidiary, by virtue of its acquisition of CBC stock, terminated CBC's rights ___ under the cross-licenses. Interpreted as Pasteur proposes, CBC's own rights under the cross-licenses would terminate with any ___ change in the identity of any CBC stockholder.  Other cross-license provisions directly undercut Pasteur's interpretation as well. See Willitts v. Roman Catholic ___ ________ ______________ Archbishop of Boston, 581 N.E.2d 475, 478 (Mass. 1991) (noting ____________________ that a contract must be interpreted as a whole). These cross- licenses explicitly authorize CBC to share its license rights with any "affiliated company," which on its face presumably encompasses a parent corporation such as bioMerieux's subsidiary. Cross-Licenses, at 1.4 (defining "Affiliated Company" as "an organization which controls . . . a party or an organization which is under common control with a party"); see supra Section ___ _____ I. Yet more importantly, CBC insisted upon a provision which would afford it the unilateral right to terminate any sublicense Pasteur might extend to a company called Genetic Systems "if control of Genetic Systems shall . . . be acquired, directly or indirectly, by any person or group of connected persons or company not having such control at the date hereof, by recon- struction, amalgamation, acquisition of shares or assets or ___________ __ ______ __ otherwise." Royalty-Free Cross-license, at 2.3 (emphasis _________ added); see PPG Indus., 597 F.2d at 1096 (noting that patent ___ ___________ 14 holder's express reservation of change-of-stock-ownership condi- tion in two patent licenses suggested its intention not to reserve condition in nine other patent licenses); see also ___ ____ Plumbers & Steamfitters Local 150 v. Vertex Constr. Co., 932 F.2d _________________________________ __________________ 1443, 1449 (11th Cir. 1991) ("[T]he doctrine of expressio unius _________ _____ est exclusio alterius instructs that when certain matters are ___ ________ ________ mentioned in a contract, other similar matters not mentioned were intended to be excluded."). Taken together, these provisions persuade us that Pasteur foresaw, or reasonably should have foreseen, that CBC might undergo changes of stock ownership which would not alter its corporate legal identity, but nonetheless chose not to condition the continued viability of its cross- licenses accordingly.12   ____________________ 12Lastly, Pasteur misplaces reliance upon In re Alltech _______________ Plastics, Inc., 5 U.S.P.Q.2d 1806 (Bankr. W.D. Tenn. 1987), where ______________ it was held that section 365(c) precluded an entity, which had acquired the corporate debtor's stock pursuant to a chapter 11 reorganization plan, from exercising the debtor's rights under a prepetition patent license. Following the conversion of its original chapter 11 reorganization case to a chapter 7 liquida- tion, Alltech discontinued all operations and discharged its employees. Before the debtor once again converted to chapter 11, its trustee liquidated virtually all its assets, except for its patent license. Noting that plan confirmation is a fact-inten- sive, equity-based inquiry, id. at 1813, the bankruptcy court ___ characterized the sale of Alltech's stock to Fluoropak Container Corporation as a de facto assignment of the patent license to a __ _____ noncontracting party. It so held because unlike CBC, Alltech had ______ ___ ceased to exist except as a "shell." Id. at 1807 & 1810 (noting ___ that "shell" emerging after Alltech's chapter 7 conversion "is in reality a different entity than the prepetition Debtor"). The bankruptcy court specifically observed that the "attempted innovative rebirth of a corporate shell is not analogous to a sale of stock by an active corporation," id. at 1810-11, and that ___ "the present case is distinguished from one where the reorganiz- ing debtor, operating continuously and in good standing with its licensor, seeks to approve the sale of its stock [to a third party]," id. at 1812. The bankruptcy court further noted that ___ 15 III III CONCLUSION CONCLUSION __________ As CBC remains in all material respects the legal entity with which Pasteur freely contracted, Pasteur has not made the required individualized showing that it is or will be de- prived of "the full benefit of [its] bargain," Leroux, 69 F.3d at ______ 612-13, under the ruling challenged on appeal. Accordingly, the ___ district court judgment is affirmed and costs are awarded to _________________________________________________________________ appellee. ________ So ordered. So ordered. __________  ____________________ the lack of demonstrated expertise on the part of Fluoropak, in utilizing the patented process to manufacture toxic-material containers, likewise posed a serious public safety risk. Id. ___ These distinguishing circumstances make Alltech inapposite. _______ 16